903 So.2d 480 (2005)
STATE of Louisiana
v.
Jerry WARD.
No. 04-KA-1295.
Court of Appeal of Louisiana, Fifth Circuit.
April 26, 2005.
*481 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Desirée M. Valenti, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
*482 MARION F. EDWARDS, Judge.
Defendant/appellant Jerry Ward was charged with forcible rape, a violation of La. R.S. 14:42.1. Following his arraignment and plea of not guilty, the bill of information was amended to charge Ward with simple rape. Ward proceeded to trial before a six-person jury and was subsequently found guilty as charged. He was sentenced to fifteen years at hard labor without benefit of probation, parole, or suspension of sentence, with credit for time served. A habitual offender bill was filed, but those proceedings are not before us on this appeal.
D.E., a mentally handicapped 20-year old, testified that she lives with her grandmother and graduated from Riverdale High School. She knew "Frederick" and his grandmother from church, and she knew "Jerry" (Ward) from school. She also knew Jerry's grandmother. On the day in question, she was at home watching television when Jerry came to her house on a bicycle. Jerry called Frederick, and then told D.E. that they were going to Jerry's grandmother's house because his grandmother wanted to tell D.E. something. Once they got there, Jerry told her that someone was going to take them to Frederick's house. She did not know the person who drove the car. D.E. was dropped off at Brother's Store, and from there she walked to Frederick's, where she met Jerry. Frederick's sister Jasmine and cousin Katie, whom D.E. knew from church, were there. D.E. went in and watched television, and when Katie and Jasmine left, she was alone with Frederick and Jerry.
In the bedroom, Jerry told Frederick to take D.E.'s clothes off. D.E. told them she had to go, but Jerry told her to stay there. Frederick put a sheet on the floor and then took her clothes off, and then both Jerry and Frederick disrobed. First Frederick "put his thing inside" of her, and then Jerry did it too. Frederick wore a red condom and Jerry wore a blue one. After Jerry was finished, D.E. put on her clothes and left. Jerry walked home with her, calling her a "bitch."
When she arrived home, D.E. told her grandmother what happened. She also told her counselor at school, and later told police officers. She identified Jerry in a photographic lineup and made an in-court identification.
R.E., grandmother of D.E., testified that D.E. lives with her. On the day of the incident, a boy came to the door to speak with D.E. D.E. then told her that Ward's grandmother wanted to speak with her. When D.E. returned home later, she appeared to have been running, and was very upset and frightened. She told R.E. that Ward had not taken her to his grandmother's, but told her they were going to his house instead. Ward told her they were going to have sex, and that she had refused. She became afraid, and Ward spread a sheet on the floor. D.E. continued that Ward was "doing nastiness" with her, and that she pushed him away. Ward had put on a condom, and when he was finished, he told Grant to do it, wiping her off with a towel. Ward was calling her a "bitch" and a "whore" and stated to her that if she told anyone what happened, he would hurt her. When it was over, she dressed and ran away.
R.E. did not contact the police because she knew Grant from church. She did not take D.E. to a doctor, except to the mental health clinic. D.E. became withdrawn. When the police contacted her, she could not identify anyone from the photographic lineup.
Jasmine Stevenson, Grant's sister, testified that Ward, nicknamed "LeeLee," came to the house that day on a bike, and *483 D.E. came on foot. Ward and Frederick were there about 5 minutes before she and Katie left. D.E. was in the front room watching television. The only time either Ward or D.E. were at the house was on that day. Katie Mitchell testified to similar effect.
Garla Stevenson, Grant's mother, testified that she has known Grant since he was a child. When she brought Grant to the police station, one of the officers mentioned Ward by name. When Ward called her on her cell phone, she told him to get down there right away, without telling him why. After Ward was arrested, he sent her a letter. In the letter, Grant admits he was in the house with D.E. but denied any sexual intercourse.
Detective Keith Forsythe of the Kenner Police Department testified that he interviewed the victim, D.E., in connection with the incident in question. During the interview, Detective Forsythe became aware that D.E. had a mental disability. According to his information, the rape occurred on May 1, 2003, but the detective did not speak with D.E. until May 16. Through the information given by the victim, suspects named "Jerry" and "Frederick" were developed, along with the location of the rape. D.E. identified Frederick Grant from a photographic lineup, and the detective obtained a search warrant for Grant's residence, the address identified by D.E. Packaged colored condoms, several pairs of underwear, an orange towel, and an orange blanket were seized from Grant's bedroom. Detective Forsythe had been advised that one of the perpetrators wore a red condom, the other one blue; and that they had put an orange sheet or blanket on the floor. The victim had also described the underwear worn by one of the suspects as having some wording written around the band.
Grant was brought to the Kenner Police department by his mother and interviewed. The detective stated that Grant admitted his participation in the incident, and that he is mildly mentally retarded. Grant's mother informed Detective Forsythe that she had contacted Ward and informed him that he had to come down to the police complex. Ward was advised of his rights and gave a statement. A tape-recorded interview was held on May 22, 2003, and the tape was played for the jury. During the interview, Ward denied having gone to D.E.'s house, denied going to Fredrick's house with D.E., and stated that he never had sexual relations with her. In the statement, Ward also concludes that in his opinion, and according to "her people's", D.E. is retarded, although when he last saw her two months ago, "she talked like any other person would talk." Following this statement, Ward was arrested.
Dr. Karen Pellerin, a clinical psychologist and assistant professor at Tulane University Medical School, was accepted as an expert in clinical psychology. Dr. Pellerin did psychological testing on D.E., who was a patient of hers at East Jefferson Mental Services Clinic. D.E. had been a patient there since she was eight years old. An intellectual battery test, which included I.Q. evaluation, achievement skills, and perceptual, motor, and developmental skills were administered. Based on these examinations, D.E. met the criteria for moderate mental retardation. She has an I.Q. of about 46, compared to the average I.Q. of about 100. Anything below 70 is considered mentally retarded. In the verbal subtest for comprehension or social judgment and reasoning, D.E. scored a 1 out of 20, with the average score being 10. In abstract reasoning, she was also very deficient, scoring a 1. D.E.'s mental age range, or cognitive functioning, would fall between 5 years and 7 months, to 8 years and 2 months.
*484 In the doctor's opinion, D.E. is moderately mentally retarded. She might be very childlike in terms of her ability to understand and process information and interact with the world. In terms of thinking or reasoning, she would not be successful. Dr. Pellerin thought that an individual who came in contact with D.E. or had some level of interaction with her would be able to tell, and it was readily apparent, that she was mentally deficient. D.E. was functioning fairly well in the modified academic setting at school.
Kimberly Ward, Ward's sister, testified that her brother was living with her in May of 2003. She testified that on May 1, 2003, Ward was at her home from 3:45 p.m. until he went to work the next day. Rick Ward, whose exact relationship to Ward was never explained, testified that Ward was asleep at Kimberly's house between 10:00 and 2:00, when he went over there to bring some money. When he returned home at about 3:00 p.m., D.E. was at his house looking for his nephew and talking to his mother and aunt.
On appeal, Ward argues that the evidence was insufficient to support his conviction for simple rape, as the State failed to prove the victim was incapable of understanding the nature of the act.
The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1] A review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.[2] A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt.[3] In applying this standard, the reviewing court does not assess the credibility of witnesses, nor reweigh evidence.[4]
La. R.S. 14:41 states:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
"Simple rape" is defined by La. R.S. 14:43, in pertinent part, as follows:
A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
...
(2) When the victim is incapable, through unsoundness of mind, whether temporary or permanent, or understanding the nature of the act and the offender knew or should have known of the victim's incapacity.
Ward urges that although there was expert testimony that D.E. suffered from moderately severe mental retardation, she *485 was successfully "mainstreamed" into society and graduated from Riverdale High School, socializing like any other student. He also points to her grandmother's characterization of D.E.'s behavior as that of a fifteen-year-old as evidence of her capacity to understand the nature of the sex act. However, R.E. also pointed out that D.E. was in "special education," and that Ward was aware of that fact. There is evidence in the record that Ward indeed did know of D.E.'s mental deficiencies.
Furthermore, Dr. Pellerin testified in depth as to D.E.'s mental capacity, confirming that anyone having everyday contact with D.E. would be able to tell that she is mentally retarded. Pellerin further stated that someone who is mentally retarded is capable of relating events from the past. D.E. can interact and communicate, and follow simple commands.
Ward avers that D.E.'s lengthy and detailed testimony revealed her to be capable of understanding "the nature of the act," and the fact that she complained to her grandmother revealed that she fully understood what had transpired. In her testimony, D.E. referred to the sex act in childlike terms. When she described the incident to her grandmother, D.E. said, "`He was doing nastiness with me.'" When she told R.E. that Ward wanted to "have sex," D.E. was using his words to her, and not her own.
La.Code Evid. art. 601 provides that every person of proper understanding is competent to be a witness except as otherwise provided by legislation. D.E. demonstrated without objection that she was competent to testify. Such competency should not be equated with the ability to understand and consent to a sexual act.
It seems beyond question that competency to testify is not the same as the capacity to understand the nature of the sexual act. There is a vast difference between understanding the distinction between the truth and a lie and understanding the nature and consequences of a sexual act.[5]
Clearly, a person, having the mental capacity of a six or seven-year-old child, does not have the capacity to consent to sexual activity.[6] The State's evidence was sufficient to prove both that D.E lacked the capacity to understand the nature of act within the meaning of R.S. 14:42.1, and that Ward knew of this incapacity. This assignment of error is without merit.
On our review for errors patent under La.C.Cr. P. art. 920, we note the record does not show that Ward was arraigned after the State amended the bill of information. However, Ward proceeded to trial without objection, and thereby waived any irregularity.[7]
We note further that the trial judge failed to advise Ward, convicted of a "sex offense" as defined by LSA-R.S. 15:541(14.1), that he must register as a sex offender as required by LSA-R.S. 15:540 et seq. We therefore remand the matter to the trial court with instructions to provide Ward with written notice of the registration requirement of LSA-R.S. 15:542 *486 and, further, that a copy of the notice and evidence of delivery be filed in the record.[8]
For the foregoing reasons, the conviction is affirmed.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722, (1998).
[2] Jackson v. Virginia, supra.
[3] State v. Joseph, 01-1211 (La.App. 5 Cir. 4/10/02), 817 So.2d 174.
[4] State v. Bradley, 03-384 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688.
[5] State v. Peters, (La.App. 4 Cir.1983), 441 So.2d 403, writ denied 530 So.2d 560.
[6] See e.g. Doe v. State, Dept. of Health & Human Resources, 623 So.2d 72, (La.App. 1 Cir.1993), writ denied 627 So.2d 653 (La. 1993).
[7] LSA-C.Cr.P. art. 555; State v. Echeverria, 03-898, p. 11 (La.App. 5 Cir. 11/25/03), 862 So.2d 163, 169.
[8] LSA-R.S. 15:543(A); State v. Tapps, 02-0547, p. 14 (La.App. 5 Cir. 10/29/02), 832 So.2d 995, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.