BROWN, C.J.
*1253 On August 25, 2016, following a jury trial, defendant, Timothy Deshun Kelly, was convicted of third degree rape. On February 2, 2017, defendant was adjudicated a fourth-felony habitual offender and was sentenced to a term of life imprisonment without the benefit of probation, parole, or suspension of sentence. Defendant now appeals his conviction and sentence. For the following reasons, defendant's conviction and sentence are affirmed.
FACTS
On January 26, 2016, defendant, Timothy Deshun Kelly, was charged by bill of information with the third degree rape of L.H.[1] on or about April 14, 2015. L.H., a developmentally disabled child, was 15 at the time of the offense, and the defendant was 35. Defendant provided L.H. with alcohol and cocaine, both of which she consumed. Defendant filed a motion for post verdict judgment of acquittal, arguing that the evidence was insufficient to convict.
The state filed a habitual offender bill of information alleging that defendant was a fourth-felony offender. The trial court denied defendant's motion for post verdict judgment of acquittal. Thereafter, the trial court sentenced defendant to 20 years at hard labor to be served without the benefit of parole, probation, or suspension of sentence.[2]
On February 2, 2017, defendant's habitual offender hearing was conducted. The state provided evidence to prove defendant's prior felony convictions for the following: (1) a September 29, 1999, conviction for possession of cocaine; (2) a January 12, 2004, conviction for distribution of cocaine; and, (3) a September 29, 2010, conviction for distribution of cocaine. The trial court took judicial notice of defendant's August 25, 2016, conviction for third degree rape and adjudicated defendant a fourth-felony habitual offender. The trial court vacated defendant's 20-year sentence and resentenced him to serve a life sentence without the benefit of probation, parole, or suspension of sentence.[3] Defendant has appealed.
DISCUSSION
Sufficiency of the Evidence
Defendant, in both his first counseled and only pro se assignment of error, alleges that the evidence was insufficient to convict him of third degree rape. Defendant concedes that he and L.H. had sexual intercourse, but he asserts that the acts were consensual. Defendant argues that the state failed to prove that L.H. was unable to consent to the sex acts due to "a stupor or abnormal condition of mind produced by an intoxicating agent or any cause" or "through unsoundness of mind." Defendant asserts that although there was *1254 testimony that L.H. was in special education classes, there was no expert testimony to establish that L.H. was incapable of understanding the acts. Furthermore, while there was evidence that L.H. had ingested cocaine, there was no evidence to establish "how" intoxicated she was at the time she had sex with defendant.
L.H., who was 16 at the time of trial,[4] testified that she met defendant while walking her baby brother to a gym for food. Defendant pulled up next to her and asked for her phone number. He called while she was still walking with her brother and met up with her. L.H. got into defendant's car and placed her baby brother in the back seat. Defendant then engaged in vaginal sexual intercourse with L.H. At some point, L.H. asked defendant to stop and he did. Afterwards, L.H. took her brother and walked home.
Later that evening, defendant called L.H. but her mother answered. Defendant hung up and tried calling back several times, but L.H.'s mother kept answering so defendant kept hanging up.
Sometime later that same night, defendant called and L.H. answered. Defendant asked L.H. "where the F [she] was" and told her to hurry and come outside. L.H. got into defendant's car and he drove her to his "homeboy house" on Greenwood Road in Shreveport, Louisiana. Defendant instructed L.H. to go hide in some bushes while defendant took his friend and his friend's girlfriend somewhere. L.H. did as she was told and defendant returned shortly after and drove L.H. to a liquor store where he purchased vodka. Defendant drank some and told L.H. to finish the bottle. L.H. drank the alcohol, which she described as "strong" and then "felt dizzy."
The two returned to defendant's friend's house and had sex in one of the bedrooms. L.H. testified that she knew she was having sex with defendant, but stated that she did not want to do so. Afterwards, defendant's friend came upstairs and wanted to have sex with L.H. but she said "no." She then asked defendant to take her home. Defendant got some cocaine from his friend and gave it to L.H. He told her to sniff it and she did. She said it made her feel "dizzy."
Defendant then drove L.H. to his sister's apartment. L.H. slept on the floor of a bedroom. In the early morning, L.H.'s mother called defendant. L.H. overheard defendant telling her mother that L.H. was with his son and a girl named "Nalo." Defendant then dropped L.H. off near her stepfather's house. L.H. had no further contact with defendant. During cross-examination, L.H. admitted that she told defendant that her little brother was her child so that he would think she was older.
Brittany Hughes, a sexual assault nurse examiner ("SANE"), testified that she performed a sexual assault examination on L.H. at Willis-Knighton Medical Center. Hughes stated that it was obvious that L.H. was mentally delayed, a fact confirmed by L.H.'s mother, who said that L.H. operated on a third-grade level. Hughes took swabs of L.H.'s mouth, breasts, vagina, and anus; she also took blood and urine samples from L.H. Hughes took photographs of L.H.'s vagina which indicated a laceration and tears to her hymen and vagina. L.H.'s pants were stained red, and Hughes noticed blood coming from her vagina. None of L.H.'s injuries required suturing or pain medication.
*1255 Shreveport Police Detective Monique Robinson met L.H. at the hospital. Detective Robinson noticed that L.H. had difficulty describing certain things, failed to make complete statements, and could not pronounce words correctly; her mother confirmed to Detective Robinson that L.H. suffered developmental delays. Based on this information, Detective Robinson stopped questioning L.H., but allowed L.H. to give a statement regarding what had happened to her. Detective Robinson arranged for L.H. to be interviewed by a forensic interviewer at the Gingerbread House Children's Advocacy Center ("Gingerbread House").
Following L.H.'s interview at the Gingerbread House, she showed Detective Robinson two locations where she said defendant, whom she referred to as "Anthony," took her to have sex. L.H. identified a house off of Greenwood Road as defendant's "homeboy house." L.H. stated that she consumed a daiquiri before having sex with defendant at defendant's friend's house, and that defendant instructed her to sniff a white substance he referred to as "soft" while there.
L.H. then directed Detective Robinson to the Aspen Apartments on Baird Road in Shreveport. L.H. recalled that defendant took her to his sister's apartment, but she could not recall the specific apartment.
L.H. told Detective Robinson that when she first met defendant, while she was walking with her brother, he took her to Ford Park and had sex with her.
Later, L.H. identified the defendant in a photographic lineup as the man who had sex with her. Defendant was arrested and a sample of his DNA was collected and sent to the North Louisiana Crime Lab. His last known address was for an apartment at the Aspen Apartments. Defendant has an older brother named "Anthony." Detective Robinson testified that defendant's date of birth is August 20, 1979.
Alex Person, a forensic interviewer with a degree in Family and Child Studies and a minor in Child Development, testified that she conducted L.H.'s forensic interview at the Gingerbread House on April 20, 2015.[5] Person identified a video recording of the interview, which was played in open court. In the recording, L.H. stated that she was walking her one-year-old brother when defendant drove up beside her in his car. He told L.H. that she was "pretty" and "fine" and asked for her phone number.
L.H. stated that she gave defendant her phone number, and he began calling her while she was still walking with her brother. L.H. answered and defendant drove back to see her. Defendant told L.H. to get in his car and she complied. L.H.'s little brother was in the back seat. Defendant then laid L.H.'s seat back, climbed on top of her, and put his "peginas" in her "private part." L.H. identified a "peginas" as a penis on an anatomical drawing of a male. She explained, using an anatomical drawing of a female, that defendant put his penis in her "private part" (vagina) until "nut" (semen) came out of his penis. He then dropped L.H. and her brother off on the same street where they had been walking.
L.H. stated that the next evening defendant called her and came to her house. He asked her "where the fuck she was" and told her to come outside and get in his car. L.H. said that she was afraid of defendant because he told her that if she "went with someone else that he would beat [her] to death." Defendant took L.H. to his "homeboy *1256 house," picked up his friend, and they all drove to a liquor store. Defendant bought alcohol and told L.H. to drink it, so she did. Then, defendant took L.H. back to his "homeboy house" and had sex with her. L.H. stated that she also "sucked his peginas." L.H. then told defendant to take her home, but he gave L.H. some cocaine and told her to sniff it. Defendant then drove L.H. to his sister's house where L.H. slept on the floor of a bedroom. The next morning, defendant had sexual intercourse with L.H. again. L.H.'s mother called defendant, and he hung up on her. Defendant then dropped L.H. off near her home. L.H. told Person that she had never had sexual intercourse with anyone before having sex with defendant.
Person stated that based on her interview of L.H., she believed that L.H. suffered from developmental delays and had an intellectual age closer to a 9- to 12-year-old. Person said that she had never heard a penis referred to as a "peginas."
Audra Williams, an expert in DNA analysis at the North Louisiana Crime Lab, testified that she received a reference sample from L.H. (a buccal swab and blood sample) and a physical evidence recovery kit ("PERK") containing oral swabs, breast swabs, neck swabs, female swabs, hair combings, and then external genitalia, perianal and anal swabs taken from L.H. by a sexual assault nurse on April 14, 2015. Williams discovered spermatozoa on the perianal swab. Further analysis allowed Williams to detect DNA from L.H. and an unknown male on the perianal and anal swab. Later, a buccal swab taken from defendant was sent to the crime lab for analysis and comparison. Williams testified that the results indicated that defendant's DNA matched the DNA found on the perianal swab taken from L.H. during the sexual assault examination.
Carla Colbert, an expert in toxicological analysis at the Louisiana State Police Crime Laboratory, testified that she received blood and urine samples taken from L.H. on April 14, 2015. L.H.'s urine sample indicated the presence of benzoylecgonine, an active cocaine metabolite.
L.H.'s foster mother, Shirley Webb, testified that L.H. had lived with her for approximately two months at the time of trial. L.H. was attending Doyline High School where she was enrolled in special education classes. Webb explained that L.H. often gets confused while doing everyday chores like getting dressed or taking care of her personal hygiene. Webb had to show her how to use the shower. Webb stated that she does not allow L.H. to cook because she's afraid she'll burn herself. L.H. will allow herself to be bossed around by Webb's other foster child who is the same age as L.H. L.H. is closer to Webb's granddaughter, a 12-year-old who helps L.H. with her homework.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter , 42,894 (La. App. 2d Cir. 01/09/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2d Cir. 01/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/06/09), 21 So.3d 297.
*1257 The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Demery , 49,732 (La. App. 2d Cir. 05/20/15), 165 So.3d 1175, writ denied , 15-1072 (La. 10/17/16), 207 So.3d 1067. A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 01/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000) ; State v. Demery , supra .
At the time of the offense, La. R.S. 14:43 provided, in pertinent part:[6]
(A) Simple rape [third degree rape] is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.
(2) When the victim, through unsoundness of mind, is temporarily or permanently incapable of understanding the nature of the act and the offender knew or should have known of the victim's incapacity.
The element of a stupor or abnormal condition of the mind produced by an intoxicating agent, such as alcohol, does not require an unaware victim with no capacity to resist, but rather an agent-influenced incapacity to effectively resist the advances of the perpetrator. See State v. Porter , 93-1106 (La. 07/05/94), 639 So.2d 1137, 1143. The degree of alcohol influence is for the jury to decide. Id. The provisions of La. R.S. 14:43 criminalize behavior which "takes advantage of a person who has had too much to drink and participates in an act to which he or she would not otherwise have consented." State v. Clark , 04-901 (La. App. 3d Cir. 12/08/04), 889 So.2d 471, 475.
With regard to the "unsoundness of mind" element of La. R.S. 14:43, courts have held that competency to testify is not the same as the capacity to understand the nature of the sexual act. State v. Peters , 441 So.2d 403 (La. App. 4th Cir. 1983), writ denied , 530 So.2d 560 (La. 1988) ; State v. Ward , 04-1295 (La. App. 5th Cir. 04/26/05), 903 So.2d 480, writ denied , 05-1718 (La. 03/17/06), 925 So.2d 533. There is a vast difference between understanding the distinction between the truth and a lie and understanding the nature and consequences of a sexual assault. State v. Peters , supra . In State v. McDowell , 427 So.2d 1346, 1350 (La. App. 2d Cir. 1983), this Court explained that the relevant inquiry regarding the victim's ability to consent in rape cases is whether the victim "understands and appreciates the nature of the act of sexual intercourse, its character and the probable and natural consequences which may attend it."
When viewed in a light most favorable to the prosecution, the evidence adduced at trial was sufficient to convict defendant of third degree rape. The medical and forensic evidence clearly establishes that defendant had vaginal sexual intercourse with L.H., a fact defendant *1258 does not dispute. The evidence was sufficient to support the jury's finding that L.H. was unable to consent to at least one of the sexual acts as she was under the influence of an intoxicating agent. L.H. testified, consistent with her Gingerbread House interview and her statement to Detective Robinson, that prior to having sex with defendant at his friend's house she consumed, at the defendant's instruction, "strong" alcohol which made her feel "dizzy." Although L.H. testified that she never lost consciousness, she explained that she did not want to have sex with defendant.
The evidence was also sufficient to support a finding that L.H. was unable to consent to any of the sexual acts because she was incapable of doing so through unsoundness of mind and defendant knew, or should have known, of her incapacity. The Gingerbread House video recording reveals that L.H. is not the average 15-year-old. During her interview and at trial, L.H. was distracted easily, used the term "peginas" to describe the defendant's penis, and did not seem to comprehend the significance of her first sexual experience. Person, an experienced forensic interviewer, testified that L.H. appeared to have an intellectual age of a 9- to 12-year-old and suffered obvious developmental delays. Likewise, Hughes and Detective Robinson both noticed immediately that L.H. suffers developmental delays. L.H.'s mother, J.H., confirmed as much and explained that L.H. operates at a third-grade level. L.H.'s foster mother, Webb, testified that at the time of trial L.H. was attending special education classes and had trouble taking care of her personal needs. Accordingly, this assignment of error lacks merit.
Excessive Sentence
Defendant argues that his life sentence is excessive. He notes that all of his prior convictions are drug offenses. He also points out that the trial court did not note any mitigating factors when imposing his original 20-year sentence.
The state counters that defendant's original 20-year sentence was vacated and thus the trial court's alleged failure to consider the sentencing factors provided in La. C. Cr. P. art. 894.1 is irrelevant. The state notes that defendant received the mandatory life sentence per La. R.S. 15:529.1(A)(4)(b).
Prior to sentencing defendant to the original sentence of 20 years, the trial court noted its review of the La. C. Cr. P. art. 894.1 sentencing factors and found that the following applied: (1) there was an undue risk defendant would reoffend if given a probated or suspended sentence; (2) defendant was in need of correctional treatment or a custodial environment; and, (3) a lesser sentence would deprecate the seriousness of defendant's crime. The trial court found no mitigating factors that applied to defendant's case.
On February 2, 2017, the trial court found defendant to be a fourth-felony offender, with two of the prior offenses being drug offenses punishable by more than a 10-year sentence, and the last felony being a sex offense with a victim under the age of 18. The trial court further noted that defendant's criminal record evidenced his intention to continue to reoffend and demonstrated that he is in need of correctional treatment. The trial court then sentenced defendant to a life sentence to be served without the benefit of parole, probation, or suspension of sentence.
A sentence violates La. Const. art. I § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver , 01-0467 (La. 01/15/02), 805 So.2d 166 ;
*1259 State v. Small , 50,388 (La. App. 2d Cir. 02/24/16), 189 So.3d 1129, writ denied , 16-0533 (La. 03/13/17), 212 So.3d 1158.
The minimum sentences mandated by the habitual offender law are presumed to be constitutional. State v. Johnson , 97-1906 (La. 03/04/98), 709 So.2d 672. The legislature's determination of an appropriate minimum sentence should be afforded great deference by the judiciary. State v. Capers , 43,743 (La. App. 2d Cir. 12/03/08), 998 So.2d 885, writ denied , 09-0148 (La. 10/02/09), 18 So.3d 102. Courts have the power to declare a sentence excessive under La. Const. art. I, § 20 although it falls within the statutory limits provided by the legislature; however, this power should be exercised only if the court finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality. State v. Johnson , supra ; State v. Lindsey , 99-3302 (La. 10/17/00), 770 So.2d 339, cert. denied , 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).
At the time of defendant's underlying offense,[7] La. R.S. 15:529.1 provided, in relevant part:
(A) Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
....
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
...
(b) If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B), a sex offense as defined in R.S. 15:540 et seq . when the victim is under the age of eighteen at the time of commission of the offense, or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for ten years or more, or of any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
Defendant fails to articulate any reason why his circumstances justify a departure from the mandatory life sentence. His criminal record demonstrates a likelihood of recidivism and the nature of his most recent offense-the rape of a young developmentally challenged girl-is particularly disturbing. The mandatory life sentence does not shock the sense of justice. This assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.

In accordance with La. R.S. 46:1844(W), the victim and her mother will be identified by their initials only.

Defendant waived the sentencing delay provided in La. C. Cr. P. art. 873.

The transcript of the habitual offender/sentencing hearing indicates that defendant was provided verbal and written notice of his obligation to register as a sex offender; he was also advised of his right to seek post-conviction relief.

L.H. testified that her birthday is February 26, 2000. L.H. identified a book, admitted into evidence as S-4, as her favorite book; the book is recommended for children ages 6 to 9.

Person testified that she has completed over a thousand forensic interviews of children age 2 to 17.

In 2015, the Louisiana legislature modified La. R.S. 14:43, changing the name of the offense from "simple rape" to "third degree rape." Any act in violation of R.S. 14:43 committed on or after August 1, 2015, was to be referred to as "third degree rape." Defendant's underlying offense was committed on or about April 14, 2015, but to avoid confusion and to maintain consistency with the record, this opinion will refer to defendant's crime as "third degree rape."

The law in effect at the time of the commission of the offense is determinative of the penalty which is to be imposed upon the convicted accused. State v. Parker , 03-0924 (La. 04/14/04), 871 So.2d 317 ; State v. Mizell , 50,222 (La. App. 2d Cir. 11/18/15), 182 So.3d 1082.